IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RANDAL SCOT SITZMAN AND <br> ANNE B. SARDOVSKY SITZMAN, <br><br> Plaintiffs, <br><br> v. <br><br> EK REAL ESTATE SERVICES OF NY LLC, ET AL., <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | Civil Action No. 3:21-CV-2666-E |

## MEMORANDUM OPINION AND ORDER

On September 29, 2022, this Court issued an Order, (Doc. 57), that—among other things—**GRANTED** Defendants' Joint Motion to Compel Arbitration, (Doc. 21), with reasoning to follow. This Memorandum Opinion and Order **VACATES** and **SUPERSEDES** only the portion of the September 29, 2022 Order, (Doc. 57), granting the Joint Motion to Compel Arbitration.

After reviewing the Joint Motion to Compel Arbitration ("the Motion"), the relevant portions of the record, and the relevant law, the Court recognizes that the Motion should be, and therefore is, **GRANTED IN PART** with respect to Defendant EK Real Estate Services of New York, LLC, and Defendant EasyKnock, Inc. The Motion, however, is **DENIED IN PART** with respect to Defendant LendingOne, LLC. Nonetheless, the Court hereby **STAYS** all of Plaintiffs' claims against all defendants, pending the resolution of arbitration.

### I.   BACKGROUND

This case arises from a sale-leaseback transaction involving Plaintiffs Randal Scot Sitzman and Anne B. Sadovsky-Sitzman's ("Plaintiffs") homestead property located on Helsem Bend Circle in Dallas, Texas ("the Property"). In 1985, Plaintiff Anne B. Sadovsky-Sitzman ("Mrs.

Sadovsky-Sitzman") purchased the Property and, shortly thereafter, constructed a home on the Property, in which she has lived ever since. Plaintiff Randal Scot Sitzman ("Mr. Sitzman") moved into the Property with Mrs. Sadovsky-Sitzman in 1986, and the couple married in 1992. Mrs. Sadovsky-Sitzman retained sole ownership of the Property until 2010, when she conveyed an interest in it to her husband—at which time the couple took joint community ownership of the Property. Until the closing of the sale-leaseback transaction at issue here, the Property was Plaintiffs' residential homestead.

In 2018, Plaintiffs fell behind on their mortgage payments. In the early months of 2019, Plaintiffs attempted to obtain a home equity loan but were twice denied. In November 2019, Plaintiffs were notified by their mortgage lender that their mortgage loan was being placed into foreclosure. Around this time, a friend suggested that Plaintiffs contact Defendant EasyKnock, Inc. ("EasyKnock"); Mr. Sitzman has testified, via sworn declaration, that Plaintiffs believed EasyKnock to be an alternative home equity lender for homeowners with poor credit. (Doc 30, Appx. 1: Decl. of Randal Sitzman, pg. 8, ¶ 11). However, EasyKnock's Chief Operating Officer has testified, via sworn declaration, that EasyKnock is a private Delaware corporation that— through its wholly-owned subsidiary EK Real Estate Services of New York, LLC ("EK Real Estate")[1]—engages in sale-leaseback transactions in which it purchases homes and leases the homes back to the former owners. (Doc. 22-6, Decl. of Barry Feierstein, pgs. 2-3, ¶ 12).

Plaintiffs reached out to EK Real Estate and entered into the transaction at issue. On October 7, 2019, Plaintiffs executed a document entitled Residential Real Estate Sales Agreement ("Sales Agreement"). (*see* Doc. 22-2, Sales Agreement). In the Sales Agreement—which identified Plaintiffs as the "Seller" and EK Real Estate at the "Buyer"— Plaintiffs "agree[d] to sell

---

[1] EK Real Estate is a single-member limited liability company registered in New York, and EasyKnock is its sole member.

and convey" and EK Real Estate "agree[d] to purchase" the Property in exchange for approximately $620,000 in consideration. (Doc. 22-2, Sales Agreement, pg. 5, ¶¶ 1-2). Furthermore, Plaintiffs agreed to "enter into a Lease with Tenant Option Agreement," which would allow Plaintiffs to continue occupying the property as a tenant while retaining the possibility of re-establishing ownership upon payment of an agreed upon purchase fee. (*see* Doc. 22-2, Sales Agreement, pg. 14, ¶ 18 & Ex. A (draft Lease Agreement)).

On November 14, 2019, Plaintiffs deeded the Property to EK Real Estate, which in turn secured the Property with a $374,000 mortgage payable to Defendant LendingOne, LLC ("LendingOne"). (*see* Doc 22-5, General Warranty Deed With Third Party Vendor's Lien). In all, Plaintiffs sold the Property for $621,356.49. (*see* Doc. 22-3, HUD Settlement Statement). Excluding fees, EasyKnock and EK Real Estate provided Plaintiffs $596,656.49. Specifically, Plaintiffs received:

   i.   $75,750.74 in cash;
  ii.   $229,206.37 to pay off their mortgage;
 iii.   $9,237.18 to pay off property taxes
  iv.   $1,716.90 to pay late fees and assessments to the homeowner's association;
   v.   $4,467.00 in December rent;
  vi.   $2,531.30 in prorated November rent;
 vii.   $9,747.00 in rent holdback to be applied to future rent; and
viii.   the option to repurchase the property, valued at $264,000.00

(*see* Doc. 22-3, HUD Settlement Statement). Once signed, EK Real Estate properly recorded the deed in the county records.

On November 16, 2019, two days after deeding the property to EK Real Estate, Plaintiffs entered into a Lease Agreement with EK Real Estate pursuant to the terms of the Sales Agreement. Under the terms of the Lease Agreement, EK Real Estate, as the "landlord," agreed to lease the Property to Plaintiffs, as "tenants," for an initial twelve-month term, renewable annually for unlimited one-year terms. (Doc. 22-1, Lease Agreement, pgs. 4-5, ¶ 5). The Lease Agreement also included an option for Plaintiffs—prior to the Lease's expiration—to (1) repurchase the Property for $373,800 (plus any applicable fees); or (2) direct EK Real Estate to sell the Property to a third party, in which case Plaintiffs would receive the resulting net profits.[2] (Doc. 22-1, Lease Agreement, pgs. 5-6, ¶ 6). In exchange, Plaintiffs agreed to pay $4,467 in rent to EK Real Estate for the initial twelve-month term,[3] to be increased each year after the initial term by the greater of (1) 2.5% or (2) an amount reflecting the increase in the cost of living as reflected by the Consumer Price Index for all Urban Consumers. (Doc. 22-1, Lease Agreement, pg. 1, ¶ 1(a), & pg. 5, ¶ 5(d)). The Lease Agreement also contained the following arbitration clause:

> **21. ARBITRATION.**
>
> **a) Arbitration Requirement**: Except as provided below OR UNLESS TENANT SUBMITS A VALID ARBITRATION/CLASS ACTION WAIVER OPT-OUT NOTICE (AS DESCRIBED BELOW), any and all claims (each, a "Claim") between Tenant and Landlord will be resolved in binding arbitration rather than in court. Tenant and Landlord agree to submit to individual arbitration the resolution of any and all claims) by or between Tenant and Landlord . . . . Tenant and Landlord agree that this Agreement affects interstate commerce, and that the enforceability of this section will be governed by, construed, and enforced, both procedurally and substantively, by the Federal Arbitration Act, 9 U.S.C. sections 1–9. Any arbitration will be administered by the American Arbitration Association ("AAA") pursuant to its then current Commercial Arbitration Rules (the "AAA Rules"), as modified by the terms set forth in this section 21.

---

[2] Net profits would be calculated as: the third-party purchase price LESS the Option Exercise Price ($373,800) Less transaction fees LESS any unpaid rent or other expenses due to EK Real Estate under the Lease. (Doc. 22-1, Lease Agreement, pg. 6, ¶ 6(b)).

[3] In actuality, Plaintiffs would pay $4,000 per month, as the $9,747 in rent holdback, mentioned above, was used to credit $467 towards monthly rent payments, and any unused portion would be applied to subsequent renewal terms or returned to Plaintiffs in the even they exercised the option to repurchase the Property. (Doc. 22-1, Lease Agreement, pg. 1, ¶ 1(a)).

> **b) Arbitration Procedure:** Any arbitration initiated by Tenant or Landlord shall be initiated in New York, New York. . . .

(Doc. 22-1, Lease Agreement, pg. 37, ¶ 21(a), (b)) (emphasis in original). Further, the arbitration clause contained an "Opt-Out" provision allowing Plaintiffs to opt-out of arbitration entirely:

> **d) Opt-out**: Arbitration is not a mandatory condition of your contractual relationship with Landlord. If Tenant does not want to be subject to the arbitration provision set forth in this section 21, Tenant may opt out of the arbitration provisions by notifying Landlord, in writing, of Tenant's intent to opt out of the arbitration provision . . . . Should you not opt-out of the arbitration provision set forth in section 21 within the thirty (30) day period, Tenant and Landlord shall be bound by the terms of the arbitration provision set forth in this section 21. Tenant has the right to consult with counsel of his, her or its choice concerning the arbitration provision set forth in this section 21. Tenant understands that Tenant will not be subject to retaliation if Tenant exercises his, her or its right to assert claims or opt-out of coverage under the arbitration provision set forth in this section 21.

(Doc. 22-2, Lease Agreement, pg. 38, ¶ 21(d)). Plaintiffs did not notify EK Real Estate of their intent to opt-out of the arbitration clause.

In March of 2021, Plaintiffs fell behind on their rent payments. In October of 2021, EasyKnock informed Plaintiffs that their lease had expired and that they were considered "holdover" tenants in the Property. On October 27, 2021, Plaintiffs sued EK Real Estate, EasyKnock, and LendingOne (collectively, "Defendants") in federal court, claiming that Defendants fraudulently induced them into the sale-leaseback transaction by falsely representing it as a home-equity loan, failed to provide certain mandatory disclosures, and charged a usurious amount of interest. (*see* Doc. 1). Plaintiffs bring claims against Defendants for: (1) suit to quiet title under the Texas Property Code; (2) declaratory relief that—among other things—Defendants have no rights, title, or ownership in the Property and that the General Warranty Deed is void as a matter of law; (3) violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1602(g) and Regulation Z § 226.2(a)(17); (4) violations of the Texas Deceptive Trade Practices Act ("DTPA");

(5) usury in violation of Texas Finance Code § 305.001(a); (6) various violations of Texas Finance Code §§ 341.011–354.007; (7) common-law fraud and statutory fraud under Texas Business and Commerce Code § 27.01; (8) conspiracy "to commit acts of fraud and other statutory and common-law torts;" and (9) aiding and abetting one another in the commission of the foregoing torts.

Defendants moved to compel arbitration of Plaintiffs' claims pursuant to paragraph 21 of the Lease Agreement included above (*see* Doc. 21). Despite the Lease Agreement's requirement that arbitration take place in New York pursuant to the AAA's Commercial Arbitration Rules, Defendants have agreed to arbitrate the case in the Dallas-Fort Worth area at location amenable to Plaintiffs under to the AAA Consumer Rules. (Doc. 22-6, Decl. of Barry Feierstein, pg. 8, ¶ 29). Plaintiffs oppose arbitration on the grounds that: (1) the arbitration clause in unenforceable under the TILA; (2) the entire transaction was procedurally unconscionable; (3) the arbitration clause is substantively unconscionable; and (4) the arbitration clause violates Texas public policy requiring litigation involving real property in Texas to occur in the venue in which the property is located.

## II. LEGAL STANDARD

The Federal Arbitration Act provides that a written agreement to arbitrate disputes arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The statute does not permit a trial court to exercise any discretion, "but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

When considering a motion to compel arbitration, courts engage in a two-step inquiry. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). First, courts determine whether "whether the parties agreed to arbitrate the dispute." *Webb v. Investacorp, Inc.*, 89 F.3d

252, 258 (5th Cir. 1996) (per curiam) (citations omitted). "This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (citations omitted). If the answer to both questions in step one is "yes," then courts determine "'whether constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

However, when an agreement to arbitrate "contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). "Delegation clauses are enforceable and transfer [a] court's power to decide arbitrability questions to the arbitrator." *Id.* The presence of a delegation clause obligates a court to "refer a claim to the arbitration to allow the arbitrator to decide gateway arbitrability issues." *Id.* (citing *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). Accordingly, if an arbitration agreement contains a delegation clause, "[a] court's analysis is limited." *Id.* In such a context, a court first determines "whether the parties entered into *any agreement to arbitrate at all*[;]" if so, the only remaining question is whether the delegation clause is valid. *Id.* at 201-02 (emphasis in original).

In determining whether parties entered into an agreement to arbitrate, courts must "distinguish between 'validity' or 'enforceability' challenges and 'formation' or 'existence' challenges." *Maravilla v. Gruma Corp.*, 783 F. App'x 392, 395 (5th Cir. 2019) (internal quotations omitted) (quoting *Arnold v. Homeaway, Inc.,* 890 F.3d 546, 550 (5th Cir. 2018). "[W]here the 'very existence of a contract' containing the relevant arbitration agreement is called into question, the federal courts have authority and responsibility to decide the matter." *Banc One*, 367 F.3d at

429 (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003)). However, because arbitration agreements are severable from underlying contracts, if a court determines that there is a properly formed agreement to arbitrate, "any remaining arguments that target the validity [or enforceability] of the contract to are questions for the arbitrator.*" Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018) (citing *Rent-A-Center*, 561 U.S. 63, 70 (2006)). The same logic applies to challenges attacking the validity or enforceability—as opposed to formation or existence—of arbitration agreements that contain delegation clauses. *Id.* Because delegation clauses are severable from arbitration agreements, a court must leave challenges the enforceability of a properly formed agreement to arbitrate to the arbitrator unless the validity of delegation clause has been specifically challenged. *Id.* (citing *Rent-A-Center*, 591 U.S. at 72).

In sum, the Court will first look to see if the parties formed an agreement to arbitrate and then determine whether that agreement contains a delegation clause. *Id.* If the arbitration agreement contains a delegation clause, and the validity of the delegation clause itself has not been specifically challenged by Plaintiffs, the clause is valid, and arbitration will be compelled. *Id.* Thus, the Court will consider arguments as to whether an arbitration agreement was properly formed, and, if there is a valid delegation clause, challenges to the arbitration agreement as a whole will be heard by the arbitrator. *Id.*

### III. ANALYSIS

For the reasons discussed below, the Court concludes that Defendants' Joint Motion to Compel Arbitration (1) is granted with respect to EK Real Estate and EasyKnock but (2) is denied with respect to LendingOne. The Court has determined that Plaintiffs' claims against all defendants must be stayed pending the completion of arbitration between Plaintiffs, EK Real Estate, and EasyKnock.

### A. Defendants' Motion to Compel Arbitration is Granted with Respect to EK Real Estate and Easy Knock but Denied with Respect to LendingOne.

First, the Court considers whether there is an agreement to arbitrate between Plaintiffs and Defendants. Second, the Court considers whether the Lease Agreement's arbitration clause delegates the question of arbitrability to the arbitrator. Finally, the Court considers the effect of such delegation on Plaintiffs' arguments against the enforceability of the arbitration clause.

*1.   There is a valid agreement to arbitrate between Plaintiffs and EK Real Estate, which EasyKnock may enforce but LendingOne may not.*

The Court concludes that an agreement to arbitrate exists between Plaintiffs and EK Real Estate, as both are parties to the Lease Agreement, which contains a binding arbitration clause. EasyKnock and LendingOne, however, are not parties to the Lease Agreement. Nonetheless, EasyKnock—as EK Real Estate's parent company—is entitled to enforce the arbitration clause against Plaintiffs under the doctrine of intertwined estoppel. This doctrine is not available to LendingOne, and, as such, LendingOne is not entitled to enforce the arbitration clause against Plaintiffs.

Whether or not the parties formed an agreement to arbitrate is governed by state contract law. *Kubala*, 830 F.3d at 201. Here, the Lease Agreement contains a choice-of-law provision selecting Texas's substantive law to govern. (Doc 22-1, Lease Agreement, pg. 15, ¶ 20).[4] Under Texas law, a binding contract requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *In re Capco Energy, Inc.,* 669 F.3d 274, 279–80 (5th Cir. 2012) (citation omitted). "Evidence of mutual assent

---

[4] The Lease's choice-of-law provision states that the "Agreement shall be governed, construed[,] and interpreted by, through and under the laws of the state in with the Property is located[.]" (Doc. 22-1, pg. 15, ¶ 20).

in written contracts generally consists of signatures of both of the parties and delivery with intent to bind." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (per curiam).

EK Real Estate has established all of the elements of contract formation through evidence. In exchange for $622,365 in consideration, EK Real Estate offered to enter into a sale-leaseback transaction, which included an agreement to arbitrate. Plaintiffs accepted the offer, as evidenced by their signatures on both the Sales Agreement and the Lease Agreement. Plaintiffs did not opt-out of the arbitration clause contained within the Lease Agreement despite having the opportunity to do so. Thus, the Court must conclude that Plaintiffs entered into a properly formed agreement to arbitrate with EK Real Estate when both parties signed and executed the underlying Lease Agreement on November 16, 2019.

While it is apparent from the record that EK Real Estate is a party to a properly formed agreement to arbitrate, the same cannot be said for the remaining defendants. Neither EasyKnock nor LendingOne were signatories to the Sales Agreement or the Lease Agreement. While EasyKnock is not party to the agreement, it is nonetheless entitled to compel Plaintiffs to arbitrate their claims against it under the doctrine of intertwined estoppel. This doctrine, however, is not available to LendingOne.

Under Texas law, the doctrine of intertwined estoppel permits a non-signatory to enforce an arbitration agreement where the non-signatory "(1) has a *close relationship* with one of the signatories, and (2) the claims [against the non-signatory] are intimately founded in and intertwined with the underlying contract obligations." *Newman v. Plains All Am. Pipeline*, L.P., 23 F.4th 393, 404 (5th Cir. 2022) (emphasis added) (citing *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 612 (5th Cir. 2016) (quoting *Cotton Com. USA, Inc. v. Clear Creek Indep. Sch. Dist.*, 387 S.W.3d 99, 105 (Tex. Ct. App.—Houston [1st] 2012, no pet.))) (additional citations omitted). "[A]

*close relationship* is a term of art generally requiring formal corporate affiliation." *Id.* at 404-05 (emphasis in original) (citing *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 640 (Tex. 2018)). Additionally, "when plaintiffs treat multiple defendants as a single unit in their pleadings, raising virtually indistinguishable factual allegations against them, then that cuts in favor of a close relationship." *Id.* at 405 (internal quotations omitted) (quoting *Hays*, 838 F.3d at 611).

First, a close relationship exists between EK Real Estate and EasyKnock under Texas law. It is undisputed that a formal corporate relationship exists between the two—EasyKnock is the sole member of the single-member limited liability company that is EK Real Estate. What's more, EasyKnock is the only recipient of notices or demands for lessor made under the Lease Agreement. (*see* Doc. 22-1, Lease Agreement, pg. 15, ¶ 19) (specifying that notices shall be given "[t]o the Landlord: EK Real Estate Services of NY, LLC c/o Benjamin Black, EasyKnock, Inc."). Finally, Plaintiffs treat EasyKnock and EK Real Estate as a single unit in the Original Complaint, raising virtually indistinguishable claims of fact against them. (*see* Doc. 1). Plaintiff's claims against EasyKnock are founded in and intertwined with the contractual agreements with EK Real Estate—the Lease Agreement; Sales Agreement; and the parties' respective obligations contained therein. Accordingly, under the doctrine of intertwined estoppel, EasyKnock is entitled to enforce the agreement to arbitrate contained within the Lease Agreement.

The same cannot be said for LendingOne. Like EasyKnock, LendingOne is not a signatory to the Lease Agreement. Unlike EasyKnock, however, the record does not show a close relationship between LendingOne and EK Real Estate. According to Defendants, LendingOne provided the business loan that financed EK Real Estate's purchase of the Property. (Doc. 22, pg. 2, n.6). This is insufficient to establish a close relationship. *See Chlarson v. EK Real Est. Servs. of*

*NY, LLC*, No. 5-21-CV-01046-XR, 2022 WL 2392648, at *6 (W.D. Tex. July 1, 2022) (holding—in a substantially similar suit against EK Real Estate, EasyKnock, and LendingOne—that no close formal relationship exists between EK Real Estate and LendingOne). As such, the doctrine of intertwined estoppel does not apply to LendingOne's request for compelled arbitration.

Further, LendingOne has not argued that it is a third-party beneficiary to the contract. While LendingOne received a deed of trust with respect to the Property from EK Real Estate in exchange for financing the purchase, that is insufficient to establish LendingOne as third-party beneficiary. Texas law presumes that non-contracting parties are not third-party beneficiaries. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 420 (Tex. 2011). To overcome this presumption, it must be shown that "the parties to the contract intended to secure a benefit to [the] third party and entered into the contract directly for the third party's benefit." *Jody James Farms*, 547 S.W.3d at 634. Because the Lease Agreement makes no mention of LendingOne whatsoever, and the parties have not otherwise demonstrated that the Sales Agreement or Lease Agreement were intended to benefit LendingOne, LendingOne may not enforce the Lease Agreement's arbitration clause as a third-party beneficiary. As such, the Court must conclude that LendingOne is not entitled to enforce Plaintiff and EK Real Estate's agreement to arbitrate.

    2.    *There is a valid delegation clause.*

The Court concludes that the agreement to arbitrate at issue here contains a valid delegation clause. "Under the FAA, parties are free to delegate questions to an arbitrator, including questions regarding the validity and scope of the arbitration provision itself." *Arnold*, 890 F.3d at 551 (citing *Rent-A-Center*, 561 U.S. at 68-70). "However, courts may not assume that parties have agreed to arbitrate threshold questions absent clear and unmistakable evidence of their intent to do so." *Id.* at 551-52 (citing *First Options*, 514 U.S. 944-45). Parties may "provide such clear and

unmistakable evidence of their intent to delegate these issues is by expressly incorporating rules empowering the arbitrator to decide substantive arbitrability." *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 537 (5th Cir. 2019) (alterations omitted) (citation and internal quotations omitted). Here, the parties have done so by expressly incorporating the American Arbitration Association's Commercial Arbitration Rules.

The Lease Agreement's arbitration clause states that "Tenant and Landlord agree that . . . [a]ny arbitration will be administered by the American Arbitration Association ("AAA") pursuant to its then current Commercial Arbitration Rules (the "AAA Rules")[.]" (Doc. 22-1, Lease Agreement, pg. 37, ¶ 21(a)). Rule 7(a) of the AAA's Commercial Arbitration Rules provides that "[t]he arbitrator shall have the power to rule on his or her jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AMERICAN ARBITRATION ASSOCIATION, Commercial Arbitration Rules and Mediation Procedures, R-7(a), p. 14 (last modified Sep. 2022), https://www.adr.org/sites/default/files/Commercial_Rules-Web.pdf. The Fifth Circuit has repeatedly held that, because Rule 7(a) provides that the arbitrator will determine questions of arbitrability, express incorporations of the AAA's Commercial Rules constitute clear and unmistakable evidence of intent to delegate gateway arbitration questions. *See, e.g.*, *Halliburton Energy Servs*, 921 F.3d at 537; *Edwards*, 888 F.3d at 746; *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). Thus, the present agreement to arbitrate clearly and unmistakably delegates questions of arbitrability to the arbitrator.

In reaching this conclusion, the Court recognizes that the Defendants did not raise the matter of the delegation clause in their Joint Motion to Compel Arbitration. This, however, does not prevent the Court from relying on the existence of the clause in its ruling. "When an issue or a

claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

> 3. *Plaintiff's arguments against enforcing the agreement to arbitrate must be heard by the arbitrator.*

Because the present agreement to arbitrate contains a valid delegation clause, Plaintiffs' arguments against the enforcing the arbitration clause must be referred to the arbitrator. Plaintiffs argue that arbitration should not be compelled because (1) the arbitration clause is unenforceable under TILA; (2) the entire transaction itself is procedurally unconscionable; (3) the arbitration clause is substantively unconscionable; and (4) the arbitration clause violates Texas public policy. These arguments do not attack the existence of a contract between the parties, the existence of an agreement to arbitrate between the parties, or the validity of the delegation clause. Instead, they attack the *enforceability* of the either the transaction, as a whole, or the arbitration clause, in particular, due to certain external legal constraints. Thus, they raise issues for the arbitrator, not the Court, to decide. *See Edwards*, 888 F.3d at 744.

First, Plaintiffs argue arbitration clause is unenforceable because § 1639c(e) of the Truth in Lending Act prohibits arbitration of claims or controversies arising out of residential mortgage loan transactions or extensions of credit secured against a principle dwelling of a consumer. (*see* Doc. 29, pg. 10). Plaintiffs assert that sale-leaseback transactions like the one in question here are equitable mortgage loans on a consumer's primary dwelling under Texas state law, bringing them under the auspices of the TILA. Plaintiffs essentially ask the Court to reach the merits of their underlying claims. However, the Supreme Court has explained that "a court may not rule on the potential merits of [an] underlying claim that is assigned by contract to an arbitrator[.]" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). Thus, whether the TILA

prohibits arbitration of this dispute is a gateway question of arbitrability that the parties have agreed to delegate to the arbitrator. *Rent-A-Center*, 561 U.S. at 68-69.

Plaintiffs' unconscionability arguments are similarly delegated to the arbitrator under the agreement's delegation clause. First, Plaintiffs' procedural unconscionability argument attacks the entire Lease Agreement, rather than the validity of the delegation clause or even the agreement to arbitrate. (*see* Doc. 29, pg. 25) ("The entire atmosphere of EasyKnock's transaction is procedurally unconscionable."). Under Texas law, unconscionability challenges of this type are a matter of enforceability, not contract formation. *See* TEX. BUS. & COMM. CODE § 2.302(a) (permitting a court refuse to enforce a contract based on unconscionability); *Maravilla*, 783 F. App'x at 396 (plaintiff's procedural unconscionability argument did not "relate to whether an agreement to arbitrate was formed [but instead] call[ed] into question the validity of the contract as a whole") (citing *Edwards*, 888 F.3d at 746)); *Ridge Natural Res., L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105 129 (Tex.App.—El Paso 2018, no pet.) (unconscionability arguments "represent affirmative defenses against the enforceability of a presumptively formed contract") (citing *In re FirstMeritBank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001) (orig. proceeding)). Because the Court has determined that an agreement to arbitrate exists, the Court may not consider general challenges to the validity or enforceability of the transaction as a whole. *Edwards*, 888 F.3d at 744. Thus, the issue of procedural unconscionability is squarely one for the arbitrator to decide. *See Rent-A-Center*, 561 U.S. at 72.; *Buckeye Check Cashing, Inc.,* 546 U.S. at 449.

Similarly, Plaintiffs' substantive unconscionability argument must be decided by the arbitrator and not the Court. Plaintiffs argue that the arbitration clause itself is substantively unconscionable because it requires that arbitration take place in New York and would impose potentially onerous fees on Plaintiffs under the AAA's Commercial Arbitration Rules. (Doc. 29,

pgs. 26-27). Like the plaintiff in *Rent-A-Center*, Plaintiffs' "substantive unconscionability argument[] assail[s] arbitration procedures called for by the contract," like the location of arbitration and the allocation of arbitration fees, "under *both* the agreement to arbitrate [disputes arising from the contract] *and* the delegation provision." *Rent-A-Center*, 561 U.S. at 74 (emphasis in original). Had Plaintiffs challenged "the delegation provision by arguing that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable," the Court would be bound to consider the challenge. *Id.* (emphasis in original). However, Plaintiffs did not do that; instead, they assert that the arbitration clause as a whole—rather than the delegation clause in particular—is unconscionable. Thus, the arbitrator must assess their substantive unconscionability challenges.

Moreover, Plaintiff's substantive unconscionability argument is mooted by EasyKnock's on-the-record representation that any potential arbitration would take place at a location in or near Dallas, Texas under the AAA Consumer Rules, which would cap Plaintiffs' arbitration costs at $200. (Doc. 22-6, Decl. of Barry Feierstein, pg. 8, ¶ 29); *see Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 300 (5th Cir. 2004) (plaintiff's prohibitive-cost argument was mooted by defendant's representation to the district court that it would pay all arbitration costs). Finally, Plaintiffs' argument that Texas public policy mandates venue of any dispute involving property in Texas to occur only in the county where the property is located is also mooted by EasyKnock's representation that arbitration—if ordered—would occur in or near Dallas, Texas.

### B.     All Claims Asserted by Plaintiffs are Stayed.

The Federal Arbitration Act permits staying a case pending arbitration. *See* 9 U.S.C. § 3. "[A] stay is mandatory upon a showing that the opposing party has commenced suit upon any issue referable to arbitration under an agreement in writing for such arbitration[.]" *Alford v. Dean Witter*

*Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). Thus, a stay of all claims against EasyKnock, and EK Real Estate is warranted because, as discussed above, both may enforce the Lease Agreement's arbitration clause.

Further, while LendingOne may not enforce the arbitration agreement, a stay of Plaintiffs' claims against it is nonetheless also warranted. The Fifth Circuit has identified three factors that weigh on whether claims against a non-signatory to an agreement to arbitrate may be stayed when compelling arbitration over claims against parties to such an agreement: "(1) the arbitrated and litigated disputes must involve the same operative facts; (2) the claims asserted in the arbitration must be 'inherently inseparable;' and (3) the litigation must have a 'critical impact' on the arbitration." *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004). "The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." *Id.*

Plaintiffs assert the following claims against LendingOne: (1) suit to quiet LendingOne's title in the Property; (2) suit for declaratory judgment that LendingOne has no rights, title, or ownership interest in the Property and that its Deed of Trust is void; (3) usury under the Texas Finance Code; (4) additional violations of the Texas Finance Code; (5) conspiracy; and (6) aiding and abetting EasyKnock and EK Real Estate's actions. Each of these claims are based on the same operative facts and are inherently inseparable from the claims asserted against EK Real Estate and EasyKnock, which are subject to arbitration for the reasons discussed above. Further, litigating Plaintiffs' claims against LendingOne could potentially influence the arbitration of Plaintiffs' claims against EK Real Estate and EasyKnock. Specifically, such litigation would require the Court to determine whether the transaction in question was, as Plaintiffs allege, a mortgage

disguised as a sale-leaseback transaction. Permitting Plaintiffs' claims against LendingOne to proceed in this Court when Plaintiffs' claims against the other two defendants proceed to arbitration would "undermine the arbitration proceedings between [Plaintiff, EK Real Estate, and EasyKnock], thereby thwart[ing] the federal policy in favor of federal arbitration." *Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002). Accordingly, the Court will exercise its discretion to stay all claims asserted by Plaintiffs against all three defendants.

### IV. CONCLUSION

For the reasons discussed above, Defendants' Joint Motion to Compel Arbitration is **GRANTED IN PART** with respect to Defendant EK Real Estate Services of New York, LLC, and Defendant EasyKnock, Inc. The Motion, however, is **DENIED IN PART** with respect to Defendant LendingOne, LLC. Nonetheless, the Court hereby **STAYS** all of Plaintiffs' claims against all defendants, pending the resolution of arbitration.

The Clerk of Court is hereby **DIRECTED** to administratively close this case, pending completion of arbitration. *See Mire v. Full Spectrum Lending, Inc.*, 389 F.3d 163, 167 (5th Cir. 2004) (explaining that district courts frequently make use of administrative closure to remove inactive cases from their pending dockets). The case may be re-opened in the future, without payment of filing fees, upon written motion from any party after conclusion of the arbitration proceedings, subject the limited judicial review set forth in the Federal Arbitration Act.

**SO ORDERED:** December 21, 2022.

_____
Ada Brown
UNITED STATES DISTRICT JUDGE